# United States Court of Appeals
## For the First Circuit

No. 02-2210

UNITED STATES OF AMERICA,

Appellee,

v.

LENNELL YORK, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Selya, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lynch, Circuit Judge.

Catherine K. Byrne, with whom the Federal Defender Office was on brief, for appellant.
John M. Hodgens, Jr., Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, and Virginia M. Vander Jagt, Assistant United States Attorney, were on brief, for appellee.

January 27, 2004

**LYNCH**, **Circuit Judge**.  Lennell York, Jr. pled guilty to mailing a threatening letter to his estranged common-law spouse in violation of 18 U.S.C. § 876.  In September 2002, York was sentenced to 41 months in prison, to be followed by three years of supervised release.  As part of his supervised release, the district court required York to participate in a sex offender treatment program and to submit to periodic polygraph testing as a means to ensure his participation in that program.

On appeal, York attacks these two conditions, neither of which will take effect until he begins his supervised release program upon his release from prison in early 2006.  We construe an ambiguous provision in the supervised release order to minimize the risk to York of coercive self-incrimination in violation of his Fifth Amendment rights, and we affirm the judgment as construed.

**I.**

Though this is solely a sentencing appeal, the facts of York's underlying offense and criminal history are pertinent to the district court's choice of supervised release conditions.  This is so by statute.  Under 18 U.S.C. § 3583(d), the district court may impose any special condition of supervised release that it considers "appropriate," provided that the condition satisfies certain specified criteria.  One such criterion is that the condition imposed be "reasonably related to the factors set forth in section 3553(a)(1)."  Id. § 3583(d)(1).  Section 3553(a)(1), in

turn, requires the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." See also U.S.S.G. § 5D1.3(b). In this case, the facts are drawn from the pre-sentence report, as amended to reflect York's minor objections, and from the transcript of the sentencing hearing. See United States v. Lopez, 299 F.3d 84, 86 (1st Cir. 2002).

In July 2000, York was an inmate in a Massachusetts house of corrections, where he was serving a sentence for a 1999 conviction for sexually assaulting a girl under the age of fourteen. On July 2, York mailed a letter to A.S., his estranged common-law wife and a relative of the girl whom he had assaulted. In the letter, York wrote: "I can not and will not let you live. I make this statement knowing full well what the consequences are. . . . You will be dead, and I will be in jail. You may take this as an idle threat if you choose to, but I will find and exterminate you. You will cease to exist." He signed the letter "L. York."

A.S. reported the letter to the authorities, and on July 13, the FBI visited York in jail. He agreed to be interviewed, signed a waiver of his Miranda rights, and admitted that he had sent the letter. His lawyer later explained that York decided to

write the letter when he learned that A.S. was planning to move away and take their children with her.[1]

A federal criminal complaint was filed against York in the District of Massachusetts in February 2002, and York was ordered detained pending indictment and trial. In April 2002, the government formally charged York with violating 18 U.S.C. § 876, which makes it a crime to send via the U.S. Postal Service any "communication . . . addressed to any other person and containing . . . any threat to injure the person of the addressee." § 876(c). On May 13, 2002, York pled guilty to the charge.

At the sentencing hearing in September 2002, the district court determined, and the parties agreed, that York's criminal history qualified him as a "career offender" under U.S.S.G. § 4B1.1. Among York's prior offenses were two convictions in Massachusetts state court for indecent assaults upon minors. In the first incident, which occurred in 1993, York bought alcohol for a minor girl who was over the age of fourteen and then subjected her to an indecent assault and battery. The second incident, which occurred in 1999, was York's sexual assault on the girl related to A.S.

In light of York's criminal history and the dictates of the career offender guideline, the district court determined that

---

[1] In July 2001, following his release from state prison and before his arrest for mailing the letter, York visited A.S. without incident.

the applicable guidelines range was 37 to 46 months.  York sought a downward departure on the basis of diminished capacity, see U.S.S.G. § 5K2.13, which the court denied on the ground that § 5K2.13 does not permit departures where the defendant's conduct involved "a serious threat of violence."  Id.  The court then added:

> I also agree with the government that . . . this particular defendant's criminal history indicates a need to incarcerate him to protect the public.  He has shown himself capable of committing, not one, but two very dastardly and heinous sexual crimes against defenseless young women . . . .

The court warned York that he would spend the rest of his life in prison if he were ever arrested again for committing a violent crime, "particularly a crime against people who are defenseless."  York was sentenced to 41 months in prison plus a three-year term of supervised release.

In addition to the standard conditions of supervised release, see U.S.S.G. § 5D1.3(c), the court imposed on York several special conditions:

> The defendant is to participate in a sex offender specific treatment program at the direction of the Probation Office.  The defendant shall be required to submit to periodic polygraph testing as a means to insure that he is in compliance with the requirements of his therapeutic program. No violation proceedings will arise based solely on a defendant's failure to "pass" the polygraph.  Such an event could, however, generate a separate investigation.  When submitting to a polygraph

-5-

exam, the defendant does not give up his Fifth Amendment rights.[2]

The government had not asked the court to impose these conditions on York, nor had the Probation Office recommended them in York's pre-sentence report (PSR).[3] Defense counsel, however, did not object when the court listed them among the conditions it was imposing.

Several months after the sentencing hearing, York filed a motion to modify the sex offender treatment and polygraph testing conditions. The district court denied the motion because York had already filed a notice of appeal to this court raising the same issues. York's motion to reconsider that denial was denied on the same ground. Cf. United States v. Distasio, 820 F.2d 20, 23 (1st Cir. 1987) (pending notice of appeal deprives the district court of jurisdiction over the substance of the appeal).[4]

_____

[2] The court further prohibited York from possessing a firearm or other dangerous weapon, ordered him to participate in a drug testing program as well as a mental health program, barred him from consuming any alcoholic beverages, and prohibited him from identifying himself by anything other than his true name. York does not challenge these special conditions on appeal.

[3] The government had sought only two of the special conditions of supervised release that the court imposed on York: the prohibition on possessing weapons and the requirement that York attend a mental health treatment program. York consented to those conditions.

[4] The district court did not require York to submit to compulsory registration as a sex offender, only to participate in a treatment program for sex offenders. This court has elsewhere recognized that "requiring registration as a sex offender is different, in type and kind, from any of the usual conditions

York attacks the conditions of his supervised release on multiple grounds.  He argues (1) that the district court could not require him to attend a sex offender treatment program as a condition of supervised release because his § 876 conviction did not involve a sex-related offense; and (2) that the mandatory polygraph testing condition is invalid because (i) it will compel him to incriminate himself in violation of his Fifth Amendment rights; (ii) it constitutes an impermissible delegation of the judicial function to non-judicial officers; and (iii) it is an inherently unreliable and thus unreasonable means of ensuring compliance with supervised release conditions.  We address each of these contentions in turn, saving for last the more troublesome issues raised by York's Fifth Amendment challenge.

## A. Standard of Review

The parties disagree on the applicable standard of review.  This court ordinarily reviews challenges to conditions of supervised release for abuse of discretion, but if the issue is forfeited, review is for plain error only.  United States v. Mansur-Ramos, 348 F.3d 29, 32 (1st Cir. 2003).  The government argues that York forfeited his objections to the conditions of his supervised release by failing to raise them during the sentencing

---

attached to supervised release." United States v. Brown, 235 F.3d 2, 4-5 (1st Cir. 2000).  No issue of registration is presented here.

hearing.  We have accepted this argument elsewhere.  <u>See, e.g.,</u> <u>id.</u>; <u>United States</u> v. <u>Brown</u>, 235 F.3d 2, 3-4 (1st Cir. 2000).

York acknowledges that he failed to object below. Nevertheless, he argues that a contemporaneous objection was not required because, given that the conduct for which he was convicted was unrelated to sex, and given that neither the government nor the PSR proposed sex offender treatment or polygraph testing, he could not reasonably have anticipated the special conditions imposed by the court. We are doubtful.  Considering York's history of sexual offenses and violence against women, it should not have been difficult to predict the court's interest in such conditions.

In any event, we need not decide which of these arguments should prevail, for our conclusion in York's case is the same under either standard of review.  But there is a serious consequence to the belatedness of York's attack.  As the government correctly points out, there is no factual record developed as to the specific sex offender treatment program that York will be required to attend, the types of polygraph exams that may be administered, or even the questions that York will likely be required to answer. While the relevant treatment programs or polygraph technology may be somewhat different in 2006, information as to existing programs and polygraph exams is surely available and would have been helpful.  A timely objection and the creation of a record would

-8-

have permitted both the district court and this court to review York's claims with the benefit of that information.

## B. Sex Offender Treatment Requirement

York argues that because his conviction was for mailing a threatening communication, not for a sex-related crime, the requirement that he participate in a sex offender treatment program imposes a "greater deprivation of liberty than is reasonably necessary" to deter criminal conduct or protect the public. U.S.S.G. § 5D1.3(b). York misunderstands the law.

The Sentencing Guidelines do not limit district courts to consideration only of the facts of the crime charged. A sentencing court should consider each defendant's history, regardless of the nature of the crime of conviction. The judge has the authority to impose any condition of supervised release that is reasonably related to (1) the defendant's offense, history, and characteristics; (2) the need to deter the defendant from further criminal conduct; (3) the need to protect the public from further crimes by the defendant; and (4) the effective educational, vocational, medical, or other correctional treatment of the defendant. U.S.S.G. § 5D1.3(b)(1); see also 18 U.S.C. § 3583(d)(1); Mansur-Ramos, 348 F.3d at 33; United States v. Peppe, 80 F.3d 19, 23 (1st Cir. 1996). Although these factors are connected by the word "and," see § 3583(d)(1); § 5D1.3(b)(1), "the critical test is whether the challenged condition is sufficiently

-9-

related to <u>one or more</u> of the permissible goals of supervised release."  <u>Brown</u>, 235 F.3d at 6 (emphasis added); <u>see also</u> <u>United States</u> v. <u>Barajas</u>, 331 F.3d 1141, 1146-47 (10th Cir. 2003) (noting that every circuit to have decided the issue has adopted this interpretation notwithstanding the "and" conjunction).  So the fact that a condition of supervised release is not directly related to York's crime of conviction does not render that condition per se invalid.

York acknowledges these principles but argues that sex offender treatment is uniquely reserved for cases involving sex offenses.  He points to U.S.S.G. § 5D1.3(d)(7), which provides that a special condition requiring the defendant's participation in a sex-offender treatment program should be imposed "if the instant offense of conviction is a sex offense."  But this is little aid to York, as the Guidelines conspicuously do <u>not</u> say that sex-offender treatment is appropriate <u>only</u> if the underlying crime was a sex offense.  In fact, the preamble to § 5D1.3(d) provides that the special conditions listed therein, including participation in a program for sex offenders, "are recommended in the circumstances described and, in addition, <u>may otherwise be appropriate in particular cases</u>." (emphasis added).  And nothing in the statute underlying § 5D1.3 limits the special condition of sex-offender

treatment to defendants under prosecution for sex crimes.[5]  See 18 U.S.C. § 3583.

There are, however, several limitations on a district court's power to fashion special conditions of supervised release. We list a few.  First, a special condition must in fact be tailored to the circumstances:  it can involve "no greater deprivation of liberty than is reasonably necessary" to achieve the purposes of supervised release.  U.S.S.G. § 5D1.3(b)(2).  Second, the condition imposed must be consistent with any pertinent policy statements from the Sentencing Commission.  Id.  Finally, the trial court's decision to impose the challenged condition must have adequate evidentiary support in the record.  Brown, 235 F.3d at 6; United States v. Thurlow, 44 F.3d 46, 46 n.3 (1st Cir. 1995) (per curiam).

Given York's criminal history and in light of the record in this case, which includes a threat of violence by York against yet another woman, the district court was well within its discretion in requiring York to participate in the sex offender

_____

[5] York relies on United States v. Scott, 270 F.3d 632 (8th Cir. 2001), in which the Eighth Circuit held that it was an abuse of discretion to require sex-offender treatment as a condition of supervised release for a defendant whose offense of conviction was armed bank robbery.  See id. at 636.  But in Scott, the only evidence of sexual misconduct by the defendant was a single conviction over fifteen years old.  The court concluded that sex-offender treatment was unnecessary because the defendant's sex-related misconduct had ceased.  Id.  York, by contrast, is a recidivist sex offender who was convicted of a sex crime only three years prior to the sentencing hearing.
    In any event, to the extent Scott conflicts with our reasoning, we decline to follow it.

-11-

treatment program. The condition that he attend sex-offender treatment is plainly related to his criminal history: York has twice been convicted for sexually assaulting young girls, including one conviction only a year before he mailed his threatening letter to A.S. See United States v. Peterson, 248 F.3d 79, 84 (2d Cir. 2001) (approving a special release condition of sex-offender treatment for a defendant convicted of bank larceny where the defendant had been convicted of a sex offense in state court five years earlier).

York's proven recidivism, moreover, makes the condition reasonably related to another permissible purpose of supervised release: protecting the public from further crimes by the defendant. In McKune v. Lile, 536 U.S. 24 (2002), the Supreme Court observed that convicted sex offenders who reenter society are "much more likely than any other type of offender to be rearrested for a new rape or sexual assault." Id. at 33. Furthermore, treatment programs of the kind the district court has required York to attend may "enable sex offenders to manage their impulses and in this way reduce recidivism." Id. The district court's remarks during sentencing make clear that the court believed that York needed such treatment and that he continued to pose a risk to young girls.

The district court committed no error, plain or otherwise, in requiring York to participate in a sex-offender treatment program as a condition of his supervised release.

## C. Mandatory Polygraph Testing

More serious is York's Fifth Amendment challenge to the mandatory polygraph testing requirement in his supervised release conditions. We turn to that question after addressing York's two threshold objections to the polygraph testing condition.

### 1. Impermissible delegation

York contends that the polygraph testing requirement, as worded in the district court's order, unlawfully delegates to non-judicial officers the power to determine matters of punishment. He argues that the district court's command that he "shall be required to submit to periodic polygraph testing as a means to insure that he is in compliance with the requirements of his therapeutic program" is vague as to the frequency, duration, and allowable scope of the questioning. By failing to specify these details, York claims, the district court impermissibly assigned to the Probation Office the power to determine the nature and extent of his punishment.

The district court committed no error in allowing York's probation officers to determine these details. Federal courts are not prohibited from "using nonjudicial officers to support judicial functions, as long as th[e] judicial officer retains and exercises

ultimate responsibility."  United States v. Allen, 312 F.3d 512, 515-16 (1st Cir. 2002) (internal quotation marks omitted).  Here, the district court left no significant penological decision to the discretion of the Probation Office:  the court itself determined that York "is to participate" in a treatment program for sex offenders and that York "shall be required" to submit to polygraph testing to confirm his compliance with his treatment regimen.  This distinguishes York's case from our recent decision in United States v. Melendez-Santana, Nos. 01-2386 & 01-2397, 2003 WL 23008812 (1st Cir. Dec. 24, 2003).  In Melendez-Santana, this court upheld a delegation challenge to a special condition of supervised release because the district court had authorized the defendant's probation officer to determine not only the details of the defendant's drug treatment, but also whether the defendant would be required to undergo such treatment.  Id. at *7; see also Peterson, 248 F.3d at 84-85; United States v. Kent, 209 F.3d 1073, 1079 (8th Cir. 2000).  In this case, the district court made all such decisions itself.

Further, contrary to York's assertion, the district court did restrict the scope of permissible questioning: the polygraph testing is "a means to [e]nsure that [York] is in compliance with the requirements of his therapeutic program."  This is a permissibly narrow delegation of administrative details.  See Melendez-Santana, 2003 WL 23008812, at *7 n.6 (the question of which drug program a defendant must attend, and when he may be

-14-

discharged, involves "administrative details" properly delegated to a probation officer); <u>Allen</u>, 312 F.3d at 516.  Indeed, the delegation here is narrower than the one that this court upheld in <u>Allen</u> as acceptable reliance on probation officers' administrative expertise.[6]  <u>See</u> 312 F.3d at 515-16 (upholding a condition requiring the defendant to participate in mental health treatment "as directed by the probation officer, until such time as the defendant is released from the program by the probation officer").

York's reliance on <u>United States</u> v. <u>Merric</u>, 166 F.3d 406 (1st Cir. 1999), is misplaced.  In <u>Merric</u>, this court vacated the defendant's sentence because the trial court impermissibly delegated to a probation officer the power to set the defendant's fine payment schedule.  <u>See</u> <u>id.</u> at 408-09.  If a probation officer cannot set a fine payment schedule, York argues, a schedule of

---

[6] Delegations to probation officers may be less likely to be problematic than those involving other officials because probation officers, while not judicial officers, are statutorily bound to serve "within the jurisdiction and under the direction" of the appointing court.  18 U.S.C. § 3602(a).  They function as an "arm of the court," <u>United States</u> v. <u>Saxena</u>, 229 F.3d 1, 5 n.1 (1st Cir. 2000), and the Sentencing Guidelines themselves entrust many correctional decisions to their discretion, <u>see, e.g.,</u> U.S.S.G. § 5D1.3(d)(7) (recommending that sex offenders participate in a treatment program "approved by the United States Probation Office").  As a practical matter, moreover, many district courts must rely on probation services to ensure the efficient administration of justice in criminal cases.  <u>See</u> <u>United States</u> v. <u>Bernardine</u>, 237 F.3d 1279, 1283 (11th Cir. 2001).  For this reason, at least one court of appeals has suggested that delegations like the one in this case are permissible in part because of the unique relationship between probation officers and the district courts. <u>See</u> <u>United States</u> v. <u>Taylor</u>, 338 F.3d 1280, 1284 (11th Cir. 2003); <u>United States</u> v. <u>Zinn</u>, 321 F.3d 1084, 1092 (11th Cir. 2003).

polygraph sessions should be equally off-limits. The analogy is not persuasive. Merric simply held that "it is the inherent responsibility of the judge to determine matters of punishment and this includes final authority over all payment matters." Id. at 409. But the schedule of installment payments for a fine or restitution order has a far more material impact on a defendant than the timing of intermittent polygraph examinations. Setting the former may be a "core judicial function," United States v. Miller, 77 F.3d 71, 78 (4th Cir. 1996) (internal quotation marks omitted), but scheduling the latter is surely a matter of administrative detail. Here, the court provided that the polygraph testing shall be "periodic," and that the purpose of the testing shall be to determine whether York is cooperating with his therapy. Further detail from the court was not required. Cf. United States v. Fellows, 157 F.3d 1197, 1204 (9th Cir. 1998) (observing that a sentencing court "cannot be expected to design and implement the particularities of a treatment program").

## 2. Inherent unreliability

York next asserts that the polygraph requirement is unreasonable, and thus invalid, because polygraph tests are inherently unreliable and cannot measure whether he is in fact complying with his treatment program. York points to the Supreme Court's acknowledgment that "there is simply no consensus that polygraph evidence is reliable." United States v. Scheffer, 523

U.S. 303, 309 (1998). In response, the United States does not deny that polygraph technology is of doubtful reliability, but it asserts that the polygraph is nevertheless a useful tool for policing defendants' compliance with conditions of supervised release. Regardless of the device's actual ability to detect lies, the government suggests, the polygraph provides an incentive for York to pursue his treatment program honestly because he may believe that if he lies about his progress, the polygraph will expose him. At least one court of appeals has endorsed this view. See United States v. Taylor, 338 F.3d 1280, 1284 n.2 (11th Cir. 2003) (polygraph testing is useful in promoting the treatment of sex offenders because "probationers fear that any false denials of violations will be detected"); see also United States v. Lee, 315 F.3d 206, 217 (3d Cir. 2003) (polygraph testing can be "beneficial in enhancing the supervision and treatment" of a sex offender).

The record in this case provides no factual foundation on which to evaluate these arguments. The court imposed the polygraph condition sua sponte; neither side submitted evidence on the usefulness or reliability of polygraph exams. This leaves a difficult empirical problem that appellate courts are not well suited to resolve. Perhaps polygraph technology has become more reliable in the five years since the Supreme Court's decision in Scheffer. Or perhaps it will be more reliable when York actually begins his supervised release in 2006. Or perhaps the whole theory

of polygraph examinations is irredeemably flawed.  Cf. Scheffer, 523 U.S. at 310 (citing studies challenging the scientific basis for polygraph tests).  Those questions are unanswerable on this record.

Similarly, we cannot accept on faith that polygraphs are effective at deterring lies, irrespective of their accuracy.  The deterrent effect of polygraph testing, after all, is related to the reliability question:  York will only be deterred from lying if he believes that a polygraph will likely expose his lies.  Perhaps polygraphs, while imperfect, are reliable enough to achieve this deterrent effect.  Perhaps they will be so reliable in 2006.  The record provides no basis on which to make such a determination.

For these reasons, we decline to issue a blanket decision on the propriety of polygraph testing as a tool of supervised release.  To the extent York fears that a false positive on a polygraph exam will automatically result in the revocation of his supervised release, the district court has anticipated and addressed his concerns.  According to the court's order, "[n]o violation proceedings will arise based solely on [the] defendant's failure to 'pass' the polygraph."  Given this prophylaxis, the use of a polygraph to promote York's rehabilitation is not per se unreasonable.  If, after his supervised release begins, York believes that he has been prejudiced by the unreliability of a polygraph test (or by the burdensomeness of the polygraph regime as

administered by the Probation Office), he is free to marshal supporting scientific evidence and petition the district court to modify the conditions of his supervised release. See 18 U.S.C. § 3583(e)(2). Until that time, any specific claim of prejudice is premature.

### 3. Fifth Amendment claim

York's most potent challenge to the mandatory polygraph requirement is that it violates his Fifth Amendment privilege against self-incrimination. York contends that in the course of his treatment program he will inevitably be asked incriminating questions, and that he will be compelled to answer due to the severe consequences to him of revocation: because his criminal history category is VI, York would face a minimum of eight months in prison if his supervised release were revoked. See U.S.S.G. § 7B1.4.

In response, the United States does not dispute that the Fifth Amendment applies in interviews with probation officers, regardless of whether a polygraph is involved. See Minnesota v. Murphy, 465 U.S. 420, 426 (1984). Instead, it argues that the mandatory polygraph condition does not on its face "compel" York to give incriminating answers. Cf. United States v. Washington, 431 U.S. 181, 188 (1977) ("[The] constitutional guarantee is only that the witness be not compelled to give self-incriminating testimony." (emphasis added)).

We begin with first principles. Nothing in the Fifth Amendment mitigates the general obligation on probationers to appear and answer questions truthfully. See Murphy, 465 U.S. at 427. Probation officers may demand honest answers to their questions, just as prosecutors may demand truthful answers from grand jury witnesses subpoenaed to testify. See id. Further, because revocation proceedings are not criminal proceedings, York will not be entitled to refuse to answer questions solely on the ground that his replies may lead to revocation of his supervised release. Id. at 435 n.7. York's probation officers, by requiring him to answer such questions, will not "compel" him to incriminate himself within the meaning of the Fifth Amendment. See id. at 427-28, 435 n.7. Of course, York will have a valid Fifth Amendment claim if his probation officers ask, and compel him to answer over his assertion of privilege, a particular question implicating him in "a crime other than that for which he has been convicted." Id. at 426. But York cannot mount a generalized Fifth Amendment attack on the conditions of his supervised release on the ground that he will be required to answer probation officers' questions truthfully.

The question, then, is whether the requirement that York submit to polygraph tests during these interviews alters the constitutional analysis. The government says that it does not, arguing that the polygraph merely enforces the general obligation

-20-

on probationers to answer questions concerning their probationary status truthfully. In the government's view, the polygraph requirement adds nothing relevant to the Fifth Amendment analysis: York might have valid claims of privilege as to particular questions, but the mandatory polygraph condition on its face does not implicate York's Fifth Amendment rights.

In fact, the polygraph requirement may implicate York's Fifth Amendment rights, depending on how the district court's order is understood. One reading of the release condition is that it flatly requires York to submit to polygraph testing as a condition of his supervised release, so that York's refusal to answer any question -- even on valid Fifth Amendment grounds -- could constitute a basis for revocation. If that reading were intended, it would be constitutionally problematic. The Supreme Court has reasoned:

> [I]f the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

Murphy, 465 U.S. at 435.

Sensitive to Fifth Amendment issues, the district court inserted a caveat in its order: "When submitting to a polygraph exam, the defendant does not give up his Fifth Amendment rights." The government argues that this qualification obviates any concern

-21-

that the polygraph requirement on its face compels York to incriminate himself. It might well have been intended to do so, but the qualification is ambiguous. The court stated only that York "does not give up his Fifth Amendment rights" in submitting to polygraph testing. That could mean (1) that York's supervised release will not be revoked based on his refusal to answer polygraph questions on valid Fifth Amendment grounds; (2) that York must answer every question during his polygraph exams on pain of revocation, but that his answers will not be used against him in any future prosecution; or simply (3) that York will be entitled, in any future prosecution, to seek exclusion of his answers on the grounds that the polygraph procedure forced him to incriminate himself. York objects to the second interpretation because he fears that it is ultra vires: the district court, he says, probably lacks the power to grant him immunity from future prosecutions, state or federal, based on information that he may reveal to his probation officers. And the third interpretation offers him no assurances at all.

The most sensible interpretation is the first, and we construe the district court's order accordingly. Under Murphy, if York can assert his Fifth Amendment privilege without risking revocation, he does not face a "classic penalty situation," 465 U.S. at 435 & n.7, and his answers will not be considered "compelled" within the meaning of the Fifth Amendment unless he is

-22-

forced to answer over his valid assertion of privilege, see id. at 429. At oral argument, the government conceded that this is the best interpretation and agreed that it is acceptable; York likewise found it preferable. Construing the order in this way also guarantees that if York and his probation officers dispute whether he refused to answer a question on valid Fifth Amendment grounds, York will be entitled to a hearing before a court before any penalty can be imposed.

We construe the district court's order to provide that York's supervised release shall not be revoked based on his valid assertion of Fifth Amendment privilege during a polygraph examination. So construed, York's sentence, including the special conditions of supervised release, is valid. See United States v. Davis, 242 F.3d 49, 52 (1st Cir. 2001) (per curiam) (construing condition of supervised release to avoid Fifth Amendment issues and upholding the sentence as construed). To the extent York raises specific Fifth Amendment objections to incriminating questions that may be asked or coercive tactics that may be employed by the Probation Office, his arguments are premature. York remains free to assert his Fifth Amendment privilege if, after he begins his supervised release term in 2006, such circumstances actually arise. See id.

**III.**

The judgment of the district court is **affirmed** as construed. **So ordered**.