# United States Court of Appeals
## For the First Circuit

No. 19-1523

UNITED STATES,

Appellee,

v.

NESTOR MORALES-CORTIJO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Kayatta, Thompson, and Gelpí,
Circuit Judges.

Rick Nemcik-Cruz for appellant.
Thomas F. Klumper, Assistant United States Attorney, with
whom Mariana E. Bauzá-Almonte, Assistant United States Attorney,
and W. Stephen Muldrow, United States Attorney, were on brief, for
appellee.

April 14, 2023

THOMPSON, **Circuit Judge**. After pleading guilty to one count under 18 U.S.C. §§ 2, 924(c)(1)(A)(ii) (using a firearm during a crime of violence; here, a carjacking), Nestor Morales-Cortijo (Morales) received a 108-month sentence -- 24 months longer than the federal sentencing guidelines recommend -- and a special condition upon his release that required him to receive psychotherapy services at the direction of the probation department. He now appeals, asserting that his above-guidelines sentence was procedurally unreasonable and that the sentencing judge erred by delegating to probation the authority to decide when his mandated therapy could stop. Having failed to preserve both arguments below, Morales must meet the exacting plain error standard, which we conclude he has not met. So, we affirm.

## Background

Because Morales's sentencing appeal follows a guilty plea, we glean the relevant facts from the undisputed presentence report (PSR), the plea agreement, and the transcript of the sentencing hearing.[1] See United States v. González, 857 F.3d 46, 52 (1st Cir. 2017).

### The Crimes

This case involves two carjackings that occurred within minutes of each other, following a gang shootout, in the town of

---

[1] Below, Morales did not challenge the PSR at all, nor did he raise any objection to the district court's recitation of the facts

Loíza, Puerto Rico.  We start with the initial altercation.  Around 4:30 PM on April 27, 2017, two rival gangs shot each other up -- their weapons of choice included rifles and pistols.  One gang was riding in a gold Lexus, but once the car was struck with and damaged by bullets, the individuals got out and fled on foot towards a nearby house, about two houses from the scene of the shootout, where they found a blue Toyota Prius parked outside.

At the house, two adults and their two children had just heard the nearby gunshots.  The mother took the children to hide in a bedroom while the father attempted to shut the front door.  The father noticed one individual (Unsub #1)[2] standing outside the front door with a rifle and at least three near the family's parked Prius.  One of the gang members demanded the Prius key from the father, who gave it up, and the crew then got in the car.  Unable to tell whether the Prius had started, the crew got out and fled on foot, entering and passing through the house, out the back door and over a back wall, with trails of blood marking their escape path throughout.  Police officers responding to the shootout would later follow that blood trail to a neighboring property where they

---

at his sentencing hearing.  In the normal course, we'd also look to the facts established at the change-of-plea hearing, see González, 857 F.3d at 52, but the record here does not contain any transcript from that proceeding.

[2] The PSR does not name any of the individuals involved in carjacking number one, but rather labels them "unsubs," shorthand for unknown subjects.

- 3 -

found and arrested one of the assailants, who was bleeding from his left arm, holding a loaded rifle and strapped with more ammunition.

On to carjacking number two. Shortly after the initial shootout and the Prius carjacking, four armed individuals approached a green Mitsubishi Lancer driving in Loíza and demanded that the owner get out of her car, pointing their weapons right at her. She complied and, as the four got into the Lancer, observed that the front passenger (Unsub #1) was bleeding from a right arm wound. The Lancer's owner saw that the one front and two rear passengers carried pistols, while the driver (later identified as Morales) had a rifle.[3] About five minutes after hearing the shootout, a witness (let's call them Witness A) saw the Lancer driving down a dead-end street behind the Jardínes de Loíza housing project and observed Morales and the front passenger exit the car. Witness A saw Morales hop a fence toward the housing project; the front passenger attempted the same maneuver but appeared to collapse near the vehicle due to his injuries.

Police officers had begun to chase after the Lancer shortly after it was stolen. One of the officers who worked in Loíza -- therefore familiar with Morales, we gather -- identified Morales as the driver. Officers caught up to the Lancer after

---

[3] Additionally, Morales later admitted as part of his plea agreement that he got into the driver's seat of the Lancer.

Morales had hopped the fence and run away, but arrested the front passenger, José Vázquez Millán, next to the Lancer after observing him throw two pistol magazines away. Millán was injured and bleeding from his arm. Police also noticed blood stains on the rear passenger seat of the Lancer. A few days later, the FBI interviewed Witness A, who provided agents a physical description of the driver. Later, Witness A was shown a photo lineup and, in a signed statement, identified the driver as Morales.

*The Legal Proceedings*

A grand jury indicted Morales and Millán on May 4, 2017, charging Morales with one count of carjacking (the Lancer), see 18 U.S.C. § 2119 (Count One), and one count of using a firearm during a crime of violence (the Lancer carjacking), see 18 U.S.C. §§ 2, 924(c)(1)(A)(ii) (Count Two). Per a plea agreement, Morales pleaded guilty to Count Two of the indictment and the government agreed to drop Count One. As part of the agreement, the parties recommended the statutorily required minimum sentence of 84 months. See U.S.S.G. § 2K2.4(b).

At sentencing, the district court expressed that she was troubled by "the entire scenario" related to Morales's offense -- that is, not just by the Lancer carjacking underlying Count Two, but also by the shootout between two rival gangs (inferring that Morales belonged to one of them) and the Prius carjacking, all of which victimized several innocent bystanders (some of whom were

- 5 -

children).  Accordingly, the court questioned whether Morales deserved the recommended guideline sentence of 84 months, given the "astonishing" nature of the "relevant conduct," the shootout and carjackings that she described as occurring in broad daylight, among the public, and using "heavy weapons."  The court noted that the "use of weapons" here contributed to a high crime rate in Puerto Rico.  As a mitigating factor, the court considered that Morales turned himself in.  Ultimately, the district court sentenced Morales to 108 months in prison and five years of supervised release.  Morales's supervised release included, among other conditions, that Morales must participate in "transitional and re-entry support services, including cognitive behavioral treatment services," supervised by probation (moving forward, we call this the "Therapy Condition"), "until satisfactorily discharged by the service provider, with the approval of the probation officer."

This appeal followed.

## Discussion

Morales raises two issues on appeal.  First, he challenges the procedural reasonableness of his sentence, arguing that the district court's rationale for the upward variance of 24 months relied on weak evidentiary support.  Second, Morales contends that the district court improperly delegated its sentencing authority to probation when imposing the Therapy

Condition, since probation, not the court, had the final say about when Morales completed treatment.

Morales concedes that he raised neither argument below, so we review both issues for plain error, a "steep climb" for Morales to make. See United States v. Alejandro-Rosado, 878 F.3d 435, 439 (1st Cir. 2017) (procedural reasonableness); United States v. Padilla, 415 F.3d 211, 218 (1st Cir. 2005) (en banc) (condition of supervised release). To get there, he must show "(1) that an error occurred (2) which was clear and obvious and which not only (3) affected his . . . substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Alejandro-Rosado, 878 F.3d at 439 (citations omitted). Before addressing each issue, we'll cut to the chase: Morales has not shown plain error for either.

*Procedural Reasonableness*

Morales cries foul at the district court's reliance on relevant conduct surrounding his use-of-a-firearm charge to justify an upwardly variant sentence.[4] He argues that there was insufficient evidence in the PSR of his participation in what the

---

[4] Where, as here, the "application of the sentencing guidelines yields a singular guideline sentence rather than a guideline sentencing range -- a sentence in excess of the guideline sentence should be treated as an upward variance." United States v. Bermúdez–Meléndez, 827 F.3d 160, 164 (1st Cir. 2016). So, Morales's 108-month sentence is "the functional equivalent of an upward variance" of 24 months from the 84-month guideline sentence. See id.; U.S.S.G. § 2K2.4(b).

court determined were related events and, to the extent the court did articulate evidence from the PSR to make her findings, she mischaracterized that evidence.  Specifically, Morales takes issue with the court:  (1) placing him at the shootout; (2) placing him at the Prius carjacking; and (3) conflating his possession and use of a pistol with rifles.  After some legal background, we address each fact-based argument in turn.

We start by explaining the difficulty of Morales's task at hand.  Since he made no "specific, supported challenges" to the PSR below, Morales cannot dispute the facts therein through rhetorical aspersions, nor can he take issue with the PSR's determination that the shootout and the Prius carjacking was conduct relevant to what he ultimately pleaded guilty (a single firearm charge for the Lancer carjacking).  See United States v. Cox, 851 F.3d 113, 121, 124 (1st Cir. 2017); see also United States v. González-Rodríguez, 859 F.3d 134, 137 (1st Cir. 2017) (explaining that failure to object to facts in PSR constitutes admission of those facts).  Morales is therefore left arguing that the district court's rationale lacked evidentiary support from, or misstated facts in, the PSR itself.  But he failed to develop any such argument below.  "The plain-error bar for challenging a district court's factual findings is especially high." United States v. González-Andino, 58 F.4th 563, 568 (1st Cir. 2023).  Because Morales's claimed error "turns on a factual finding

- 8 -

[he] neglected to ask the district court to make, the error cannot be clear or obvious unless he shows that the desired factual finding is the only one rationally supported by the record below." Id. (cleaned up).

Given that standard, Morales must convince us that the PSR only rationally supported a finding that he was not present at the shootout or the Prius carjacking, or that he never used a rifle. See id. Problem is, the PSR belies his desired view of the facts.

We begin with Morales's presence at the shootout. The unchallenged PSR explicitly stated that Morales had a shotgun scar on his arm "as a result of the shootout he was involved [in] during the instant offense," so Morales functionally admitted to being present there. See González-Rodríguez, 859 F.3d at 137 (not challenging the PSR's facts functions as admitting them). And Morales conceded in his brief that he "was in the company of three others who did participate in the shootout."

We move next to Morales's presence at the Prius carjacking. The district court reasonably inferred from the unchallenged PSR that the same individuals who fled the shootout also entered and abandoned the Prius after not knowing whether it had started, then carjacked the Lancer right after. The PSR stated that "[s]hortly after the UNSUBS fled the scene of the first carjacking, Victim 3 was in her [Lancer] . . . when she observed

- 9 -

at least four armed UNSUBS approach her vehicle," and that "Unsub #2" (later identified as Morales) was present at both carjackings. Moreover, the individuals at both carjackings left blood trails from their gunshot wounds, first in and around the house where the Prius was parked and second all over the Lancer's interior, suggesting it was the same injured crew.

On to Morales's pistols and rifles argument. The unchallenged PSR states that the Lancer's owner identified Morales as carrying a rifle when he got in the driver's seat of the Lancer, and Morales later admitted to driving the Lancer. The district court otherwise accurately stated the PSR's description of those in Morales's crew that possessed rifles and additional magazines of ammunition, and from our review of the PSR and the sentencing transcript, the district court, contrary to Morales's assertions, never directly attributed rifle possession to Morales (even though the record would have supported such a finding).[5]

Therefore, the district court's factfinding was well-supported by the PSR, and Morales has failed to demonstrate any factfinding to the contrary. So, we find no plain error, and

---

[5] To the extent Morales takes issue with the district court's rhetorical characterization of the weapons used during these three events as "heavy weapons," we see no plain error here. Morales himself admits the weapons included "common military rifle[s]," and the PSR establishes that multiple individuals carried these rifles and additional magazines of ammunition.

reject Morales's contentions that faulty factfinding made his upwardly variant sentence procedurally unreasonable.[6]

*Delegation of Supervised Release Condition*

For his second claimed error (also getting the plain-error treatment), Morales contends that the district court improperly delegated its sentencing authority when imposing the Therapy Condition because his participation in that court-mandated program was for an "unspecified frequency and duration," thus empowering the probation officer to decide whether and for how long he must stay in treatment.[7]

Before assessing Morales's claim, it would be helpful to give it some legal context. Article III of the Constitution prohibits federal courts from delegating to nonjudicial officers (such as probation) their core judicial function, including the imposition of conditions of supervised release. See United States

---

[6] Finding no plain error with the crux of the district court's relevant conduct factfinding, Morales's more granular factual quibbles with the district court's recitation of the PSR's facts at sentencing (e.g., misstating the distance between buildings near the Lancer carjacking) do not move us. Even assuming the district court misstated or exaggerated these relatively minor facts, Morales cannot show a different outcome given our conclusions above.

[7] Recall the Therapy Condition stated, "The defendant shall participate in transitional and re-entry support services, including cognitive behavioral treatment services under the guidance and supervision of the probation officer. The defendant shall remain in the services until satisfactorily discharged by the service provider, with the approval of the probation officer."

- 11 -

v. Allen, 312 F.3d 512, 515-16 (1st Cir. 2002); United States v. York, 357 F.3d 14, 22 (1st Cir. 2004). But that prohibition does not extend to courts "using nonjudicial officers," like probation officers, "to support judicial functions, as long as [the court] retains and exercises ultimate responsibility." Allen, 312 F.3d at 515-16 (quoting United States v. Johnson, 48 F.3d 806, 809 (4th Cir. 1995)). To determine whether a special condition violates this rule, we "distinguish between . . . delegations that merely task the probation officer with performing ministerial acts or support services" and those that permit the officer to "decide the nature or extent" of the punishment itself. United States v. Mike, 632 F.3d 686, 695 (10th Cir. 2011).

Here, Morales contends that the Therapy Condition offends this delicate constitutional balance because the probation officer had "final authority for discharge from therapy." Morales's arguments, however, run right up against our precedent. In United States v. Allen, we took no issue with a nearly identical condition of supervised release that required the defendant to participate in mental health treatment "as directed by the probation officer, until such time as the defendant is released from the program by the probation officer." See 312 F.3d at 515-16. There, we reasoned that the delegation of authority was lawful because the court had merely delegated "administrative details" to the probation officer, while the court retained the ultimate

- 12 -

sentencing authority when it required Allen to undergo treatment in the first place.  See id. at 516 (citing United States v. Peterson, 248 F.3d 79, 85 (2d Cir. 2001) ("If the district court intends that the therapy be mandatory but leaves a variety of details, including the selection of a therapy provider and schedule to the probation officer, such a condition of probation may be imposed.")).  As we later explained, "the probation officer in Allen was not deciding whether the defendant had to attend counseling but how many sessions he had to attend."  United States v. Meléndez-Santana, 353 F.3d 93, 101 (1st Cir. 2003) (vacating condition of release that empowered probation officer to decide whether defendant would have to undergo treatment), overruled in part on other grounds by United States v. Padilla, 415 F.3d 211 (1st Cir. 2005).  Here, the condition imposed by the court similarly required Morales to "participate in transitional and re-entry support services, including cognitive behavioral treatment services under the guidance and supervision of the probation officer," and "remain in the services until satisfactorily discharged by the service provider, with the approval of the probation officer."

We are unpersuaded by Morales's various attempts to distinguish Allen and its progeny.

First, Morales says the facts here are different.  He claims that in Allen, unlike here, the record showed that the

- 13 -

defendant had a history of mental illness. And he says that this case is different because here, the probation officer has the final decision to continue or discontinue treatment after the healthcare professional makes its recommendation.[8]

Again, Allen stands in the way of Morales's contentions. To be sure, in Allen we relied upon "persuasive guidance" from other circuits "for the proposition that special conditions . . . should be evaluated in light of the facts of the case as reflected by the entire record." Allen, 312 F.3d at 516 (citing Peterson, 248 F.3d at 85; United States v. Kent, 209 F.3d 1073 (8th Cir. 2000)). Specifically, we noted that the Eighth Circuit rejected the imposition of a special condition that required the defendant to undergo mental health treatment "after examining the entire record" because it found that the "judge had stated outright that the parole officer would be the one to determine whether [the] defendant had to attend counseling," and "that the record did not demonstrate that the defendant had mental health problems." Id. (citing Kent, 209 F.3d at 1075, 1078-79).

---

[8] Morales did not argue here or below that the Therapy Condition improperly delegates the question of when treatment should end to the service provider rather than to probation. Indeed, he questions whether the probation officer should have any say in the conclusion of treatment instead of entrusting that decision to "a trained health care professional." Nor did Morales argue that the condition fails to specify whether Morales could be required to continue therapy even beyond his term of supervised release. So, we don't address either point.

But we approved Allen's challenged condition, concluding that it was the court, not the probation officer, that imposed mental health treatment in the first place, and that the record contained sufficient evidence of Allen's mental illness and alcohol abuse, which further "indicate[d] that the court was imposing mandatory counseling . . . ." Id.; see also Meléndez-Santana, 353 F.3d at 101.

So too here. The record makes clear that the court imposed the condition requiring Morales to participate in therapy "under the guidance and supervision of the probation officer." And the record also provides an overview of Morales's history of substance abuse that supports the court's imposition of the condition -- prior to his arrest, Morales was taking about fifteen painkillers a day. See United States v. Siegel, 753 F.3d 705, 716 (7th Cir. 2014) (concluding that cognitive behavioral therapy is a proper condition to impose on a defendant with a history of substance abuse).

Second, Morales asserts that our case law has "curtailed" Allen's reach.[9] Morales refers specifically to our holding in Meléndez-Santana that a court cannot delegate to

---

[9] In fact, we have since relied upon Allen to uphold conditions of supervised release delegating administrative details of mental health treatment programs to the probation officer. See United States v. Chan, 208 F. App'x. 13, 16 (1st Cir. 2006); York, 357 F.3d at 21.

- 15 -

probation the maximum number of drug tests that a defendant on supervised release must undergo, so by that "same logic" the trial court here must specify the number of therapy sessions Morales must undergo.

We disagree. Morales's argument compares apples to oranges. In Meléndez-Santana, we read a specific statutory provision, not applicable here, that requires a court to order a defendant to "submit to a drug test within 15 days of release on supervised release and at least 2 periodic drug tests thereafter (as determined by the court) for use of a controlled substance." Meléndez-Santana, 353 F.3d at 101 (quoting 18 U.S.C. § 3583(d)). We held that the specific "as determined by the court" language in the statute "requires courts to determine the maximum number of drug tests to be performed beyond the statutory minimum of three, with probation officers permitted to decide the number of tests to be performed within the range established by the court." Id. at 106. There is no similarly limiting statutory language here as to the number or duration of treatment sessions, only a requirement that the court specify which treatment it was ordering. See 18 U.S.C. § 3563(b)(9) (permitting court to require a defendant to submit to "psychological treatment . . . as specified by the court"); 18 U.S.C. § 3583(d)(3) (applying section 3563(b) to supervised release).

Our reasoning in Allen applies with equal force to the delegation here, and Morales has not shown any plain error on the district court's part in imposing the Therapy Condition.[10]

**Conclusion**

For the reasons stated above, we affirm.

---

[10] As we've noted before in this context, defendants are "not without recourse should the probation officer abuse the discretion delegated to [them]." United States v. Mercado, 777 F.3d 532, 537 (1st Cir. 2015). They may move the district court "at any time prior to the conclusion of a supervised release term [to] 'modify, reduce, or enlarge the conditions of supervised release.'" Id. (quoting 18 U.S.C. § 3583(e)(2)).