# United States Court of Appeals
## For the First Circuit

No. 18-2097

UNITED STATES OF AMERICA,

Appellee,

v.

BRIAN K. ROGERS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

Robert C. Andrews for appellant.
Benjamin M. Block, Assistant United States Attorney, with
whom Halsey B. Frank, United States Attorney, was on brief, for
appellee.

February 19, 2021

HOWARD, **Chief Judge**.  While on supervised release after serving a term of incarceration for possession of child pornography, Brian K. Rogers underwent two polygraph examinations and admitted to accessing the internet to view pornography, thereby violating a condition of his release.  After ignoring his sex offender treatment clinician's instruction to contact his probation officer about the violation, Rogers was suspended from the treatment program, thereby violating another condition of his release.  On those facts, the court revoked Rogers's supervised release and sentenced him to six months of imprisonment and an additional eight years of supervised release.  On appeal, Rogers argues that the revocation of his release violated his Fifth Amendment privilege against self-incrimination and that his suspension from treatment violated his right to due process under the same.  We affirm.

**I.**

In 2012, a jury convicted Rogers of one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2).  Later that year, the district court sentenced him to sixty months of imprisonment and eight years of supervised release.  As special conditions of his release, he was required to "participate and comply with the requirements of the Computer and Internet Monitoring Program" and to "fully

- 2 -

participate in sex offender treatment as directed by the supervising officer." Rogers was released in 2013.

In 2017, the court revoked Rogers's supervised release after he admitted to violating the two aforementioned special conditions. The court sentenced him to time served and an additional eight years of supervised release, with the same two special conditions as before. New for Rogers's second term of supervised release, his conditions of release also included a requirement that he "submit to periodic random polygraph examinations as directed by the probation officer to assist in treatment and/or case planning related to behaviors potentially associated with sex offense conduct." The condition disclaimed that "[n]o violation proceedings will arise solely on the defendant's failure to pass a polygraph examination, or on the defendant's refusal to answer polygraph questions based on 5th amendment grounds," but it added that "[s]uch an event could, however, generate a separate investigation."

Rogers participated in one such polygraph examination on June 2, 2018. The examiner asked whether Rogers had "accessed or viewed any X-rated pornography during the last sixteen months," and Rogers's negative response was determined to be deceptive. The examiner also asked Rogers whether he had viewed pornography featuring prepubescent minors, and Rogers's negative response to this question was deemed inconclusive. In an interview after the

polygraph examination, Rogers admitted that he had used his roommate's cellular telephone to view pornography on one occasion.

A professional polygraph examiner performed a follow-up polygraph examination of Rogers on August 27, 2018. The examiner did not verbally tell Rogers that he had a right not to participate, but Rogers signed a consent form that indicated that Rogers "consent[ed] voluntarily" to the examination and understood that he did "not have to take this examination . . . and [he could] stop this examination at any time." As part of a preliminary interview lasting over two hours, Rogers told the examiner that he had used an undisclosed internet-enabled Nintendo 2DS video gaming system to view pornography on a regular basis for a period of three months. During the examination proper, the examiner asked Rogers whether "[b]esides someone showing [him]," he "personally accessed X-rated pornography since January 1st"; whether "[b]esides that Nintendo," he "personally use[d] another secret Internet device to view pornography in the past year"; and whether he "purposely accessed prepubescent minors online since August 2017." Rogers answered "No" to all three questions but was determined to have failed the polygraph examination.

Rogers's probation officer was informed of his confessions to the second examiner and of his having failed the polygraph examination. The probation officer discussed how to handle Rogers's confessions with Rogers's treating clinician on

August 31, 2018. The confessions and polygraph failures compounded Rogers's already poor performance in sex offender treatment, throughout which he had neglected to share experiences when directed to do so in group sessions, failed to complete assignments in his workbook, reported thoughts about harming another individual, and generally demonstrated a lack of motivation. Rogers's probation officer and his clinician decided that the clinician would discuss Rogers's confessions and polygraph, as well as his overall performance in the treatment program, at his next scheduled appointment on September 4, 2018.

At the appointment, the clinician observed that Rogers "continued to be unmotivated and unwilling to accept responsibility." The clinician directed Rogers to contact his probation officer before Rogers's next treatment session on September 11, 2018, in order to continue sex offender treatment. Rogers failed to do so, and so, after discussion with the probation officer, the clinician suspended Rogers from sex offender treatment. The probation officer then contacted Rogers, and during the resultant conversation, Rogers admitted to her that he had used the Nintendo 2DS to view pornography and "said that he doesn't trust treatment, he doesn't trust probation, and . . . he would rather be in custody than on supervision." After that conversation, the probation officer initiated the internal process for filing a petition to revoke Rogers's supervised release.

The probation officer testified that she had used the information gained at Rogers's polygraph examination, as well as the fact that he was suspended from sex offender treatment, to justify filing a petition to revoke his supervised release. She also acknowledged that she had no other evidence that Rogers had used an unmonitored, internet-capable device outside of Rogers's admissions in the interview conducted as part of the polygraph examinations and in his subsequent conversation with the probation officer. She stated, however, that she had additional evidence of Rogers's failure to fully participate in his sex offender treatment program, citing specifically Rogers's failure to reach out to her when directed to do so by his clinician, as well as Rogers's failure to complete certain assigned activities and avowed lack of motivation to continue participating in treatment.

On November 1, 2018, after an evidentiary hearing, the district court revoked Rogers's supervised release, sentencing him to six months in prison and eight additional years of supervised release. The court based its judgment on Rogers's violations of the special conditions that he abide by the Computer and Internet Monitoring Program and that he fully participate in the sex offender treatment program.

This timely appeal followed.  We have jurisdiction under 28 U.S.C. § 1291.[1]

## II.

We generally review a district court order revoking a defendant's supervised release for abuse of discretion.  See United States v. Colón-Maldonado, 953 F.3d 1, 3 (1st Cir. 2020) (citing United States v. Wright, 812 F.3d 27, 30 (1st Cir. 2016)).  In doing so, we review legal questions de novo and factual findings for clear error.  Id. at 3-4.

## A.

Rogers's first of two principal contentions is that the polygraph examination requirement and the examinations themselves compelled him to make self-incriminating statements in violation of the Fifth Amendment, and that the district court therefore erred

---

[1] While the six months of imprisonment imposed by the district court upon its revocation of Rogers's supervised release has expired, Rogers's appeal is not moot because the district court also imposed a term of supervised release of eight years to which Rogers remains subject.  See, e.g., United States v. Sostre-Cintrón, 911 F.3d 54, 58 (1st Cir. 2018) ("Notwithstanding the completion of [the defendant's] imprisonment term, these challenges are not moot because his period of supervised release continues."); United States v. Carter, 860 F.3d 39, 43 (1st Cir. 2017) (finding a defendant's sentencing challenge was not moot even though he had completed his prison sentence because he was still under supervised release and thus "has a real stake in challenging his sentence").  Furthermore, unlike in United States v. Suarez-Reyes, 910 F.3d 604 (1st Cir. 2018), where we found that the defendant's release from prison rendered his appeal moot, id. at 605-06, here Rogers requested a sentence that included a longer term of imprisonment with no term of supervised release, and the government has not argued that Rogers's appeal is moot.

by relying on those statements in its decision to revoke his supervised release. The government disputes Rogers's assertion that the polygraph examination requirement and resultant questioning compelled him to make the statements at issue. Because we agree with the government, we do not address whether the polygraph requirement or the questions posed to Rogers resulting from his compliance with that requirement would have been "reasonably expect[ed]" to elicit an incriminating response from him, such that the Fifth Amendment privilege attached in the first place. Minnesota v. Murphy, 465 U.S. 420, 428 (1984); see also id. at 435 n.7 (noting that the privilege is unavailable where "the questions put to a probationer . . . posed no realistic threat of incrimination in a separate criminal proceeding"). We briefly discuss the applicable law before turning to Rogers's argument.

**1.**

The Fifth Amendment provides in relevant part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As the Supreme Court has explained, "the Fifth Amendment speaks of compulsion"; "[i]t does not preclude a witness from testifying voluntarily in matters which may incriminate him." Murphy, 465 U.S. at 427 (quoting United States v. Monia, 317 U.S. 424, 427 (1943)) (internal quotations marks omitted) (alterations omitted). In line with that interpretation, the Court has articulated a "general

rule" that in order for testimony to be considered "compelled" within the meaning of the Amendment, "the privilege must be claimed when self-incrimination is threatened." Id. at 434. If a person does not invoke it and chooses to speak, any resultant testimony "will not be considered to have been 'compelled,'" id. at 427 (quoting Monia, 317 U.S. at 427), but rather "voluntary," id. at 429.

The Court in Murphy applied these principles in addressing a probationer's challenge to the use of statements that he made to a court-mandated counselor in a subsequent criminal proceeding. It reasoned that in accordance with the general rule that one's Fifth Amendment privilege must be invoked, a probationer's "general obligation to appear and answer questions truthfully" does not "in itself convert . . . otherwise voluntary statements into compelled ones" unless that probationer both "invokes the privilege and shows that he faces a realistic threat of self-incrimination" but is nevertheless "required to answer." Id. at 427. Absent such an invocation, the probationer must show that he falls within one of the few recognized "exception[s]" to the general rule that the privilege must be invoked in order for resultant testimony to be considered "compelled." Id. at 429-40.

Of those exceptions, by virtue of which the privilege is "self-executing," id. at 436, Rogers only relies on one. Specifically, the "penalty" exception is triggered in situations

where a person's very right to invoke his Fifth Amendment privilege is penalized, such that he can be considered to have been deprived of a "free choice" between testifying and remaining silent. Id. at 434 (quoting Garner v. United States, 424 U.S. 648, 661 (1976)). The Court recognized that one "classic penalty situation" is when the government, "either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation." Id. at 435. In that situation, the exception would operate such that any testimony elicited therefrom is "deemed compelled and inadmissible in a criminal prosecution." Id.

The Court ultimately concluded that Murphy failed to claim his Fifth Amendment privilege and did not fall within any of the recognized exceptions. Id. at 429-40. In explaining why Murphy could not avail himself of the "penalty" exception, the Court distinguished Murphy's situation from that of the petitioners in Garrity v. New Jersey, 385 U.S. 493 (1967), in which the Court held that New Jersey violated the Fifth Amendment when it threatened state employees who were subjects of an investigation that they would lose their jobs if they invoked the privilege against self-incrimination. Id. at 495-500. The Court found that the choice "either to forfeit their jobs or to incriminate themselves" was impermissibly "likely to exert such pressure upon an individual as to disable him from making a free and rational choice." Id. at 497 (second quoting Miranda v. Arizona, 384 U.S.

- 10 -

436, 464-65 (1966)). The Court in Murphy distinguished Garrity on the basis that the latter's investigators had "expressly informed [the state employees] . . . that an assertion of the privilege would result in the imposition of a penalty," whereas the Court found "no reasonable basis for concluding that Minnesota attempted to attach an impermissible penalty to [Murphy's] exercise of the privilege," or for Murphy to have believed "that his probation would be revoked if he remained silent." Id. at 437-38.

Against this backdrop, in United States v. York, 357 F.3d 14 (1st Cir. 2004), we examined a defendant's challenge to a supervised release condition that, like the one at issue here, required him "to submit to periodic polygraph testing as a means to insure that he [was] in compliance with the requirements of his" mandatory sex offender treatment program. Id. at 18. We recognized that York's Fifth Amendment challenge to the mandatory polygraph examinations was a "potent" one, because the requirement could have "implicate[d] [his] Fifth Amendment rights" if it were construed to "flatly require[] York to submit to polygraph testing as a condition of his supervised release, so that York's refusal to answer any question -- even on valid Fifth Amendment grounds -- could constitute a basis for revocation." Id. at 24. But we found that the better reading of the condition -- in light of its qualifier that "[w]hen submitting to a polygraph exam, the defendant does not give up his Fifth Amendment rights," id. at 18

- 11 -

-- was that it prevented a revocation of supervised release based on his invocation of the privilege. Id. at 25.

Recently, in United States v. Hood, 920 F.3d 87 (1st Cir. 2019), we applied York to uphold a special condition of supervised release identical to the one imposed on Rogers here. Id. at 93. Our holding rested on our understanding that the qualifier attached to the condition -- that "[n]o violation proceedings will arise solely on the defendant['s] failure to pass a polygraph examination, or on the defendant's refusal to answer polygraph questions based on 5th amendment grounds" -- prevented the government from basing a revocation of supervised release in any way (not just "solely") on the invocation of the privilege. Id. at 93-94 (alterations in original). It is thus settled law in this circuit that a court can impose mandatory periodic polygraph examinations in connection with sex offender treatment programs as a condition of supervised release, where the condition prohibits basing any revocation in any way on the defendant's assertion of his Fifth Amendment privilege. See also United States v. Brewster, 627 F. App'x 567, 570-71 (7th Cir. 2015) (collecting cases and finding that "[e]very circuit to consider the issue has upheld the imposition of polygraph testing as a condition of supervised release").[2]

_____

[2] We recognize that Hood contemplated a potential challenge to the constitutionality of revoking supervised release based on

**2.**

In light of this applicable law, Rogers's options on appeal are limited.  This is largely because nothing in the record indicates that he ever asserted or even attempted to assert his Fifth Amendment privilege, and he does not now allege otherwise. In consequence, he cannot make out a straightforward claim that his Fifth Amendment privilege was violated because he invoked it but nevertheless was compelled to give self-incriminating testimony.  Instead, Rogers offers two different contentions.

First, Rogers conclusorily asserts that "polygraph examination in the context of sex offender treatment programs is a form of compulsion so severe that it renders any statement made during such an exam involuntary and inadmissible in any proceeding," or put differently, that "statements made during a polygraph examination are the result of compulsion and therefore involuntary."  This would be a significant departure from existing doctrine.  Indeed, Rogers seems to be asking us to recognize a new exception to the general rule that the Fifth Amendment privilege

---

an investigation prompted by the invocation of the privilege during a mandatory polygraph examination.  920 F.3d at 94 n.3.  The instant case does not require us to decide, and we do not decide, that issue. We note, however, that the invocation of the privilege does not by itself prevent the government from investigating or prosecuting the underlying conduct.  See Kastigar v. United States, 406 U.S. 441, 453 (1972) ("The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted.").

- 13 -

against self-incrimination is not self-executing. Specifically, the thrust of the assertion is that the privilege should automatically apply to protect anyone undergoing a polygraph examination, on the ground that such examinations inherently will elicit involuntary responses. Moreover, based on the facts of this case, Rogers's conclusory argument means that any and all responses to polygraph examination questions are "compelled," even when an examinee explicitly agrees to undergo the examination and actively participates in it after having been clearly informed that his supervised release would not be revoked based on his refusal to answer upon invoking his Fifth Amendment privilege.

Rogers does not offer any authority or developed argument to support his view, so we might conclude that the claim is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). But even if it isn't waived, we would reject it because it is contradicted by our decision in York, where we found that periodic polygraph examinations as a condition of supervised release, where the condition makes clear that the supervised releasee may invoke his Fifth Amendment privilege without penalty, are no more compulsory than mandatory interviews with probation officers in which the probationer is required to be truthful and which the Supreme Court held to be lawful. 357 F.3d at 24-25 (citing Murphy, 465 U.S. at 426-28, 435 & n.7). Here, the special condition at issue included the same "limiting language" that we

- 14 -

found satisfied those criteria in Hood.  920 F.3d at 93-94.  Only subsequent controlling authority can upend that precedent.  See United States v. García-Cartagena, 953 F.3d 14, 27-28 (1st Cir. 2020).  Rogers cites none.

The rule that perhaps most closely resembles the exception that Rogers asks us to create is that which requires "the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it."  Murphy, 465 U.S. at 430 (citing Miranda, 384 U.S. at 467-69).  But the Supreme Court has repeatedly emphasized that this "extraordinary safeguard 'does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.'"  Id. (quoting Roberts v. United States, 445 U.S. 552, 560 (1980)).  The Court expressly rejected the expansion of the exception to include probation interviews, finding any coercive pressures that inhere in them, including the risk of revocation of probation were the probationer to decide to terminate the interview, to pale in comparison to those of custodial interrogations.  Id. at 430-34.  We are not persuaded that polygraph examinations of persons under supervision should be treated differently.

Thus, the only question that remains is whether a penalty was attached to Rogers's potential invocation of the privilege. That brings us to Rogers's second argument in support of his Fifth Amendment claim. He asserts that he falls within the well-established "penalty" exception to the general rule that the Fifth Amendment privilege against self-incrimination is not self-executing, because his supervised release was revoked at least in part because of statements he made resulting from his compliance with the mandatory polygraph examination requirement. Rogers says that York is no barrier to his claim because in that case we addressed a facial challenge to conditions of supervised release, whereas here Rogers's release was actually revoked and therefore he was actually penalized. On the facts of this case, however, this amounts to a distinction without a difference.

The "penalty" exception only applies when the very ability to invoke the Fifth Amendment privilege is penalized. The cases that Rogers relies on are explicit on this point. Indeed, Rogers asks us to "apply" Garrity, and he cites Justice Kennedy's plurality opinion and Justice O'Connor's concurrence in McKune v. Lile, 536 U.S. 24 (2002). But the plurality opinion in McKune acknowledged that "the so-called penalty cases," including Garrity, "involved free citizens given the choice between invoking the Fifth Amendment privilege and sustaining their economic livelihood." 536 U.S. at 40 (emphasis added). Justice O'Connor's

concurrence similarly understood that line of cases to prohibit "penalties levied in response to a person's <u>refusal to incriminate himself or herself</u>" that were severe enough to have "compel[led]" the incriminating statements. <u>Id.</u> at 49 (same). Moreover, as earlier discussed, the Court in <u>Murphy</u> had previously distinguished <u>Garrity</u> in particular on the ground that government officials had "expressly informed [the state employees] . . . that an <u>assertion of the privilege</u> would result in the imposition of a penalty." <u>Murphy</u>, 465 U.S. at 438 (same). Here, as in <u>Hood</u>, the polygraph condition's qualifier suffices to defeat any notion that the condition itself threatened to penalize Rogers's assertion of the privilege, and nothing in the record even suggests that anyone threatened him in this way. <u>See</u> 920 F.3d at 93-94.

Accordingly, Rogers's Fifth Amendment privilege against self-incrimination was not violated.

**B.**

Rogers also argues that his suspension from sex offender treatment violated his Fifth Amendment right to due process, because the suspension prevented him from continuing on supervised release even though he was not afforded sufficient process to contest the suspension.[3]

---

[3] Rogers also contends that, as a matter of substantive due process, his revocation deprived him of the right to be free from termination of a sex offender treatment program on the basis of statements obtained through a polygraph examination. However, he

- 17 -

Rogers bases his due process argument almost exclusively on a single district court case from outside this circuit, <u>Beebe</u> v. <u>Heil</u>, 333 F. Supp. 2d 1011 (D. Colo. 2004). There, the District Court for the District of Colorado concluded that an inmate had a cognizable liberty interest in participating in sex offender treatment because his suspension from treatment would have automatically rendered him ineligible for parole. <u>Id.</u> at 1016-17. Thus, accepting for the sake of argument the premise that <u>Beebe</u>'s reasoning supports the conclusion that Rogers had a cognizable liberty interest in participating in a sex offender treatment program, that interest arose not from a right to participate in sex offender treatment for its own sake, but from the potential consequences of suspension: the revocation of his supervised release.

But there is a material difference between Beebe's and Rogers's respective circumstances. Beebe complained that he was rendered ineligible for parole "without prior written notice of the reason for his termination, without an opportunity to be heard by a neutral factfinder, without an opportunity to present evidence in his defense, and without an opportunity to present witnesses in his defense." <u>Id.</u> at 1012-13. Here, by contrast, Rogers

---

makes no argument why the Due Process Clause would provide broader protection in this context than the Self Incrimination Clause does, and therefore our conclusion above that the Self Incrimination Clause is not implicated here precludes this argument.

participated in a full evidentiary hearing between his suspension from treatment and the revocation of his supervised release -- precisely the kind of process that Beebe had requested.

Accordingly, Rogers's Fifth Amendment right to due process was not violated.

### III.

The district court's order revoking Rogers's supervised release is **affirmed**.